613 N.W.2d 810 (2000)
259 Neb. 954
Alfred V. BARTLETT et al., appellants and cross-appellees,
v.
DAWES COUNTY BOARD OF EQUALIZATION, appellee and cross-appellant, and Tax Equalization and Review Commission of Nebraska, appellee.
Nos. S-99-1211 to S-99-1216.
Supreme Court of Nebraska.
July 7, 2000.
*812 Laurice M. Margheim, of Curtiss, Moravek, Curtiss & Margheim, Alliance, and Patrick M. Connealy, of Crites, Shaffer, Watson, Connealy & Harford, Chadron, for appellants.
Dennis D. King, of Smith and King, P.C., Gordon, for appellee Dawes County Board of Equalization.
HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
HENDRY, C.J.

INTRODUCTION
Alfred V. Bartlett, Dale W. Anderson, Pamela B. Anderson, Ormund Whitsel, Eleanor Whitsel, Robert Marshall, and Donald Littrel (hereinafter taxpayers), property owners in Dawes County, brought property valuation protests to the Dawes County Board of Equalization. The board denied the protests, and taxpayers appealed to the Tax Equalization and *813 Review Commission (TERC). TERC found that the procedure utilized by the board in addressing the protests was arbitrary and unreasonable, but affirmed the board's denial of the protests. Taxpayers now appeal, and the board cross-appeals. We granted taxpayers' petition to bypass, see Neb.Rev.Stat. § 24-1106(2) (Reissue 1995).

BACKGROUND
In April 1998, due to problems with the assessment of property in Dawes County, the Dawes County assessor divided the county into four agricultural "market areas" for property tax purposes. The boundaries for each market area were based upon where "assessment to sales ratios" for various land sales fell on the county map. The land sales used in determining the market areas came from a "qualified sales report" compiled by the Property Tax Administrator pursuant to Neb.Rev.Stat. § 77-1360.01 (Cum.Supp. 1998). A chart depicted the assessment-to-sales ratios for the various sales which were grouped in ranges, with each range being labeled with a letter ("Ratios: 40% under = X, 41%55% = 0, 56%70% = Z, 70%85% = C, 85% up = H"). The letter representing the assessment-to-sales ratio for each sale was plotted on the map where the sale had occurred. The county was then divided into the "market areas" by drawing lines around the various sales locations, along township or half-township lines. There is no zoning in Dawes County.
Each year, the Property Tax Administrator prepares reports informing TERC of the quality of assessments in each county in Nebraska. See Neb.Rev.Stat. § 77-5027 (Cum.Supp.1998). Assessments in Dawes County were not acceptable even after the creation of the market areas and the adjustments made by the assessor. The acceptable range of assessment for agricultural land is from 74 to 80 percent of the actual value. Neb.Rev.Stat. § 77-5023 (Cum.Supp.1998). Assessments in Dawes County were at only 70 percent. Pursuant to Neb.Rev.Stat. § 77-5026 (Cum.Supp.1998), if TERC determines that equitable assessment of property in the state cannot be made without adjusting the value of a class or subclass of property in a county which it deems overvalued or undervalued, TERC may hold a hearing during which legal representatives of the county may show cause as to why the adjustment should not be made. Pursuant to this statute, TERC held a show cause hearing on May 13, 1998, at which the Dawes County assessor appeared, in order to discuss how to remedy the situation.
The record of the hearing indicates that several alternatives were considered by TERC and the assessor to bring the agricultural class of land into the acceptable statistical range. TERC members noted that none of the market areas as delineated by the assessor fell within the acceptable range. However, the assessor believed that the adjustments should be done by location of the land instead of by land use. Thus, another alternative was developed, basing the adjustments in valuations on the market areas established by the assessor. At the conclusion of the hearing, TERC ordered adjustments to the assessments of agricultural land based on the market areas established by the assessor.
TERC issued a written order adjusting values on May 14, 1998. The order stated the following with respect to the adjustments to agricultural land:
That the value of the agricultural subclasses of property in the County be adjusted to the midpoint of the acceptable range (i.e., 77%), which requires that the subclasses be adjusted as follows:
a. That there shall be no adjustment to the median indicated level of value for agricultural land in Agricultural Area 1.

*814 b. That the median indicated level of value for agricultural land in Agricultural Area 2 shall be increased by 62%.
c. That the median indicated level of value for agricultural land in Agricultural Area 3 shall be decreased by 18%.
d. That the median indicated level of value for agricultural land in Agricultural Area 4 shall be increased by 92%.
The Dawes County assessor complied with TERC's order and implemented the adjustments by market areas.
Taxpayers are farmers and ranchers who own agricultural land divided by the lines between agricultural market area one (Area 1) and market area four (Area 4). The adjustments by market area implemented by the assessor in compliance with TERC's May 14, 1998, order caused the valuation of taxpayers' properties in Area 4 to increase to nearly double the amount at which it was previously valued, while adjoining property located in Area 1 did not increase. Taxpayers filed property valuation protests with the board to protest the valuation of their property in Area 4.
In August 1998, the board filed its own petition with TERC pursuant to Neb.Rev. Stat. § 77-1504.01 (Cum.Supp.1998), which allows a county board to petition TERC to consider an adjustment to a class or subclass of property. The petition requested that TERC revise the sales roster for agricultural land and either issue a stay of or reverse its order of May 14, 1998.
When taxpayers' protests were presented to the board, the board made the following notation on taxpayers' protest forms, "The Board of Equalization has chosen to keep agricultural land assessments at their present level, as ordered by T.E.R.C., pending the outcome of the Board's petition." However, TERC dismissed the board's petition in an order dated August 7, 1998.
Taxpayers then filed appeals from the board's denial of their protests with TERC, and the cases were consolidated for hearing. At the hearing, Dixie Eaton, Dawes County assessor in 1998, testified that she divided Dawes County into four market areas by plotting the sales in the county based on the assessment-to-sales ratios and by looking at soil maps. She testified that the market areas were drawn on township lines or half-township lines, even though soil type divisions do not follow township lines. Eaton testified that there are eight subclasses of grassland in Dawes County. These subclasses are known as 1G, 1G-1, 2G, 2G-1, 3G, 3G-1, 4G, and 4G-1. These subclasses are based on soil type. The market areas established by the assessor are not consistent with the soil classifications depicted on the soil map of Dawes County.
Taxpayers Marshall, Bartlett, Littrel, and Dale Anderson each testified that there was no difference between the land they own in Area 4 as opposed to the land they own in Area 1. Taxpayers also adduced evidence that the land sales in Area 4 included in the qualified sales report were not sales of agricultural land. Taxpayers testified as to the fair market values of their land, which ranged from $100 to $129 per acre. Taxpayers also produced evidence of the fair market value of their land through their expert witness, Bruce Sheopner, who opined that taxpayers' land was worth $114 to $130 per acre. Sheopner further testified that the land sales in Area 4 contained in the qualified sales report were not sales of agricultural property.
Connie Sandoz, who took office as the Dawes County assessor in 1999, testified that there is no difference in the soil type, type of grass, or carrying capacity of taxpayers' land located in Area 4 as opposed to land located in Area 1. However, Sandoz testified that subclass 4G grassland in Area 4 was assessed at $150 per acre, *815 while subclass 4G grassland in Area 1 was assessed at $75 per acre. Sandoz also testified that land classified as subclass "2D" in Area 4 was assessed at $480 per acre, compared to $250 per acre in Area 1. Sandoz agreed that adjoining lands for every subclass of land along the boundary of Area 1 and Area 4 had "vastly different values." When asked for her justification of this difference in value, Sandoz stated, "There has to be a line somewhere...."
In its findings and order dated September 22, 1999, TERC found that the board represented to the taxpayers that "no action would be taken" upon their protests pending the outcome of the board's petition to TERC to adjust values. TERC determined that the board "failed to consider the merits" of taxpayers' protests and that such action was unreasonable and arbitrary. TERC determined that by not addressing the taxpayers' protests, the board "ignored the statutory duty to equalize assessments." TERC determined that the process utilized by the board in maintaining the assessments at their current levels pending the outcome of the board's petition was arbitrary and unreasonable.
TERC further determined that taxpayers had failed to show the actual or fair market value of their property, that establishment of market areas is a professionally accepted mass appraisal technique, and that the taxpayers' challenge to the sales included in the qualified sales report constituted a collateral attack on a decision of the Property Tax Administrator. TERC further found that the issues raised by taxpayers regarding the increased valuation constituted a collateral attack on TERC's prior orders of May 14 and August 7, 1998. TERC then affirmed the board's denial of the protests.

ASSIGNMENTS OF ERROR
Taxpayers claim, rephrased and summarized, that TERC erred in (1) determining that taxpayers' challenge constituted a collateral attack on TERC's orders of May 14 and August 7, 1998, (2) failing to find that adjustments to agricultural land based solely on location rather than the class or subclass of property were unlawful and resulted in the failure to assess agricultural land uniformly and proportionately, (3) affirming the board's decision after finding that the board failed to consider the merits of taxpayers' protests and finding such failure to be unreasonable and arbitrary, (4) finding that taxpayers adduced no evidence to establish the board's determination of values was unreasonable, (5) finding that taxpayers' challenge to the qualified sales report constituted a collateral attack on the decision of the Property Tax Administrator, (6) denying taxpayers due process by reviewing the results of its own prior order, and (7) failing to reduce the valuation of taxpayers' properties to the lowest value of the same class and subclass of similar property located in the county.
The board, in its cross-appeal, claims TERC erred in determining that the board's method of addressing taxpayers' protests was arbitrary and unreasonable.

STANDARD OF REVIEW
Decisions rendered by TERC shall be reviewed by the court for errors appearing on the record. Neb.Rev.Stat. § 77-5019(5) (Supp.1999); Phelps Cty. Bd. of Equal. v. Graf, 258 Neb. 810, 606 N.W.2d 736 (2000); Pittman v. Sarpy Cty. Bd. of Equal., 258 Neb. 390, 603 N.W.2d 447 (1999). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. Pittman, supra; US Ecology v. Boyd Cty. Bd. of Equal., 256 Neb. 7, 588 N.W.2d 575 (1999). However, in instances where an appellate court is required to review cases for error appearing on the record, questions of law are *816 nonetheless reviewed de novo on the record. Constructors, Inc. v. Cass Cty. Bd. of Equal., 258 Neb. 866, 606 N.W.2d 786 (2000).

ANALYSIS

COLLATERAL ATTACK
Taxpayers claim TERC erred in its determination that taxpayers' challenge to the adjustments by market area constituted a collateral attack on TERC's prior orders.
When a judgment is attacked in a way other than by proceeding in the original action to have it vacated, reversed, or modified, or by a proceeding in equity to prevent its enforcement, the attack is a collateral attack. County of Adams v. Nebraska State Bd. of Equal., 252 Neb. 847, 566 N.W.2d 392 (1997). The rule regarding collateral attack on a judgment applies not only to courts of general jurisdiction, but also to administrative boards and tribunals acting in a quasi-judicial capacity. Schilke v. School Dist. No. 107, 207 Neb. 448, 299 N.W.2d 527 (1980). See, also, County of Adams, supra. The board argues that an order of an administrative agency is not subject to collateral attack in the absence of fraud or bad faith and that there was no fraud or bad faith in this case. The board's argument assumes that taxpayers' challenge constitutes a collateral attack.
We have consistently held that a property owner's exclusive remedy for relief from overvaluation of property for tax purposes is by protest to the county board of equalization. Olson v. County of Dakota, 224 Neb. 516, 398 N.W.2d 727 (1987); Riha Farms, Inc. v. Dvorak, 212 Neb. 391, 322 N.W.2d 801 (1982). An appeal may then be taken from the order of the county board of equalization fixing the assessed value of the property. Id. This remedy is full, adequate, and exclusive. Id. Such a claim cannot be made, in the first instance, by direct application to any other body or by a collateral attack in law or equity in the event of failure to bring the matter before the county board of equalization and to appeal therefrom in case of an adverse determination. Id.
TERC's order of May 14, 1998, ordered the adjustments by market areas, and TERC's order of August 7, 1998, denied the board's petition to TERC to reconsider the adjustments. Taxpayers were then given notice of the adjustments, and they filed their protests. This was taxpayers' first and only opportunity to challenge any of these issues. The protest procedure and appeal therefrom is taxpayers' sole method of challenging the 1998 property valuations. Taxpayers do not have the opportunity to challenge the increase in the valuation of their property outside of the protest procedure. Thus, taxpayers' challenge does not constitute a collateral attack on TERC's prior orders. TERC erred in determining that taxpayers' challenge to the 1998 adjustments was a collateral attack.

ADJUSTMENTS TO VALUATION BY "MARKET AREA"
Taxpayers also claim that TERC erred in failing to find that TERC's adjustments to agricultural land by market area rather than by class or subclass of property was unlawful and void.
Section 77-5026 provides:
Pursuant to section 77-5023, if the commission finds that a just, equitable, and legal assessment of the property in the state cannot be made without increasing or decreasing by a percentage the value of a class or subclass of property as returned by any county, the commission shall issue a notice to the counties which it deems either undervalued or overvalued and shall set a date for hearing at least five days following the mailing *817 of the notice. The notice shall be mailed to the county clerk, county assessor, and chairperson of the county board. At the hearing the legal representatives of the county may appear and show cause why the value of a class or subclass of the property of the county should not be adjusted. At the hearing, the commission may receive testimony from any interested person.
The May 13, 1998, show cause hearing was held pursuant to this section. TERC's order of May 14 purported to be ordering adjustments to subclasses of agricultural land. These "subclasses" were, in actuality, the market areas delineated by the assessor.
Agricultural land constitutes a separate and distinct class of property for purposes of property taxation. Neb.Rev.Stat. § 77-1361(1) (Cum.Supp.1998). Neb. Const. art. VIII requires uniform and proportionate assessment within the class of agricultural land. Agricultural land is then divided into "categories" such as irrigated cropland, dry cropland, and grassland. Neb. Rev.Stat. § 77-1363 (Cum.Supp.1998). These categories are further divided into subclasses based on soil classification. Id.
Section 77-5027 provides in part, "[TERC] shall, pursuant to section 77-5026, raise or lower the valuation of any class or subclass of property in a county when it is necessary to achieve equalization." (Emphasis supplied.) TERC's order of May 14, 1998, in which it ordered adjustments to agricultural land assessments (Area 1, no adjustment; area two, 62-percent increase; area three, 18-percent decrease; and Area 4, 92-percent increase), was not an adjustment to the value of a subclass of property as authorized by § 77-5026 and 77-5027. TERC has the authority to increase or decrease "by a percentage the value of a class or subclass of property." In this case, TERC ordered increases and decreases by various percentages based on where the land was located within the "market areas."
Although TERC's order claims to be adjusting subclasses of agricultural land, a "market area" is not a subclass of agricultural land recognized by our statutes. Subclasses of agricultural property must be based on soil classification for purposes of taxation. § 77-1363. Although the assessor claims to have used soil maps in establishing the market areas, the market areas bear little resemblance to the soil map of Dawes County. Eaton admitted that township lines do not follow soil classifications. The market area map itself shows only the assessment-to-sales ratios for the various sales plotted on the map, with the market area boundaries drawn around them. The evidence in this case indicates that the market areas established by the assessor were not, in fact, based on soil classification, but, instead, were based on assessment-to-sales ratios. Subclasses of agricultural land must be based on soil classification, not upon where the land is located. The market areas do not constitute subclasses of agricultural land as defined by our statutes. Thus, TERC was without authority to order adjustments to agricultural land by market area, and such adjustments were in violation of the statutory scheme set out by the Legislature.
The board argues that TERC correctly found on appeal that the establishment of market areas is a professionally recognized method of mass appraisal under Neb.Rev.Stat. § 77-112 (Cum.Supp. 1998), which provides:
Actual value of real property for purposes of taxation shall mean the market value of real property in the ordinary course of trade. Actual value may be determined using professionally accepted mass appraisal methods, including, but not limited to, the (1) sales comparison approach, taking into account factors *818 such as location, zoning, and current functional use, (2) income approach, and (3) cost approach.
Assuming without deciding that market area analysis is a professionally accepted mass appraisal method for establishing actual value, the problem in this case is that the "market areas" were used by TERC as a basis for ordering adjustments for purposes of equalization under § 77-5026.
When ordering an adjustment for purposes of equalization, TERC is authorized to adjust only by class or subclass. § 77-5027. The market areas involved in this case do not constitute a class or subclass of agricultural land; therefore, TERC's determination that market area analysis is a professionally accepted method of mass appraisal for purposes of ascertaining actual value does not justify TERC's 1998 adjustments.
TERC was without authority to order adjustments to agricultural land based on the market areas because the market areas involved in this case do not constitute subclasses of property recognized by our statutes. We therefore determine that the adjustments to agricultural land valuations implemented by the assessor pursuant to TERC's May 14, 1998, order must be reversed.

ACTION OF COUNTY BOARD
Taxpayers further claim that TERC erred in affirming the board's denial of taxpayers' protests after determining that the board's failure to address the merits of the protests was arbitrary and unreasonable. The board cross-appeals on this issue, claiming TERC erred in determining that the board's action was arbitrary and unreasonable.
Neb.Rev.Stat. § 77-1510 (Cum.Supp. 1998) provides in part, "Appeals may be taken from any action of the county board of equalization to the Tax Equalization and Review Commission in accordance with the Tax Equalization and Review Commission Act." Neb.Rev.Stat. § 77-1511 (Reissue 1996) provides in part:
The Tax Equalization and Review Commission shall hear appeals and cross appeals taken under section 77-1510 as in equity and without a jury and determine anew all questions raised before the county board of equalization which relate to the liability of the property to assessment, or the amount thereof. The commission shall affirm the action taken by the board unless evidence is adduced establishing that the action of the board was unreasonable or arbitrary or unless evidence is adduced establishing that the property of the appellant is assessed too low.
We have held that § 77-1511 creates a presumption that a board of equalization has faithfully performed its official duties in making an assessment and has acted upon sufficient competent evidence to justify its action. Constructors, Inc. v. Cass Cty. Bd. of Equal., 258 Neb. 866, 606 N.W.2d 786 (2000). That presumption remains until there is competent evidence to the contrary presented, and the presumption disappears when there is competent evidence adduced on appeal to the contrary. Id.
A county board of equalization has the duty to correct and equalize individual discrepancies and inequalities in assessments within the county. AT & T Information Sys. v. State Bd. of Equal., 237 Neb. 591, 467 N.W.2d 55 (1991); Neb.Rev. Stat. §§ 77-1501, 77-1502, and 77-1504 (Cum.Supp.1998 & Supp.1999). In carrying out this function, the county board must give effect to the constitutional requirement that taxes be levied uniformly and proportionately upon all taxable property in the county. AT & T Information Sys., supra. See, also, § 77-1501. This basic duty of county boards of equalization *819 remains unchanged by enactment of the Tax Equalization and Review Commission Act. See §§ 77-1501, 77-1502, and 77-1504 (Reissue 1996, Cum.Supp.1998 & Supp. 1999).
A county board of equalization may address equalization issues each year between June 1 and July 25. & sect; 77-1504. County boards of equalization must also rule on protests within this time period. § 77-1502. A county board of equalization may file its own petition with TERC, on or before July 26, requesting an adjustment to a class or subclass of property. See § 77-1504.01 (Supp.1999).
TERC determined that the board ignored its duty to equalize assessments based on language the board placed on taxpayers' protest forms, stating, "The Board of Equalization has chosen to keep agricultural land assessments at their present level, as ordered by T.E.R.C., pending the outcome of the Board's petition." TERC noted that by not addressing the issues raised in the protests, in the event that the board's own petition to TERC was denied, the board would have lost the opportunity to equalize assessments within the limited timeframe under which it is authorized to equalize assessments. TERC found the board's method of handling the protests to be arbitrary and unreasonable.
The board's own language placed on the protest forms is sufficient to rebut the presumption that the board faithfully performed its official duties in making an assessment and acted upon sufficient competent evidence to justify its action. The board's notation on the protest forms indicates that the board essentially took no action on taxpayers' protests and simply decided to await the outcome of its own petition to TERC. The board's petition was subsequently dismissed by TERC. As TERC determined in its order, this resulted in the board's losing the ability to equalize assessments within the allotted timeframe. The board had a duty to address the equalization issue, which it failed to do. TERC was correct in determining that this action by the board was arbitrary and unreasonable, and the board's cross-appeal is without merit.
We therefore determine that TERC must remand these consolidated protests to the board for a determination on the merits, taking into consideration our determination that TERC's May 14, 1998, order in which it adjusted agricultural land values by market areas was unauthorized. Accordingly, we need not address the remaining assignments of error.

CONCLUSION
For the foregoing reasons, we reverse TERC's decision of September 22, 1999, affirming the board's denial of taxpayers' protests, and remand this cause to TERC with orders to remand the consolidated protests to the board for further proceedings regarding the 1998 tax year, consistent with this opinion and in conformity with Neb. Const. art. VIII, requiring uniform and proportionate assessment within the class of agricultural land.
The board's cross-appeal is dismissed.
REVERSED AND REMANDED WITH DIRECTIONS.